James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
Telefax: (212) 385-9010
E-mail: jim.hohenstein@hklaw.com
        lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
James N. Hood as Liquidating Trustee of the
Oceantrade Corporation Liquidating Trust

**08 CV 02360**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES N. HOOD AS LIQUIDATING TRUSTEE
OF THE OCEANTRADE CORPORATION
LIQUIDATING TRUST,

          Plaintiff,

       -against-

WAJILAM EXPORT (SINGAPORE) PTE
LIMITED,

          Defendant.

---

08 Civ.    (    )

**VERIFIED COMPLAINT**

      Plaintiff, James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust ("Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against defendant, Wajilam Export (Singapore) Pte Limited, ("Wajilam" or "Defendant"), alleges, upon information and belief, as follows:

1.      This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all material times herein, James N. Hood as Liquidating Trustee for the Oceantrade Corporation Liquidating Trust maintained and maintains an address at 285 Highland Avenue, Norwalk, CT, 06854-4017.

3.      On or about October 15, 2005, Oceantrade Corporation ("Oceantrade") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*.

4.      On or about October 4, 2007, Oceantrade filed a Chapter 11 Plan of Liquidation ("Plan"), which was confirmed by order of the Bankruptcy Court for the Southern District of New York on December 4, 2007 ("Confirmation Order").

5.      Pursuant to the Plan and the Confirmation Order, James N. Hood was appointed as Liquidating Trustee, with full authority to assert, prosecute, and settle all causes of action including, but not limited to, causes of action on behalf of Oceantrade against third parties relating to accounts receivable.

6.      At all times material herein, Oceantrade  was a business entity organized and existing under the laws of the Marshal Islands with a principal place of business at c/o Bulkamerica Corporation, 137 Rowayton Avenue, Rowayton, Connecticut, 06853.

7.      At all times material herein, Bulkamerica Corporation ("Bulkamerica") was agent for Oceantrade under an agency agreement dated August 31, 2001 and engaged in business transactions on behalf of Oceantrade pursuant to that agreement, including the transaction herein.

8.      Upon information and belief, at all times material herein, Wajilam was a business entity organized and existing under the laws of Singapore with a principal place of business at 63, Robinson Road, #05-20 Afro Asia Building, Singapore, 068894.

9.      On or about July 1, 2004, Oceantrade, as disponent owner[1] of the vessel ORIENT GLORY ("Vessel"), and Wajilam, as Charterer, entered into a charter party for the Vessel ("Time Charter"), in accordance with the terms and conditions of a clean fixture recap.  A true and correct copy of the fixture recap is attached hereto as Exhibit 1.   The fixture recap incorporated by reference the terms and conditions of the  charter party of the M/V ORIENT GLORY "between Ocean Transport [sic] and "Parkroad Corp, Seoul"" ("*Pro Forma*").  A true and correct copy of the *Pro Forma* is attached hereto as Exhibit 2.

10.     Oceantrade agreed to charter the Vessel to Wajilam for one time charter trip to transport with logs (no mahogany logs) from Philippines and/or Malaysia to India with a duration of about 35-40 days without guarantee.  Exhibit 1.

11.     According to the terms of the Time Charter, the rate of hire was US$14,000.00 per day pro rata including overtime.  Exhibit 1.

12.     The Time Charter provided that hire was payable 15 days in advance.  Exhibit 1; Exhibit 2 line 52.

13.     The Time Charter further provided that *"for the last 15 days or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners . . . otherwise failing the*

---

[1] A disponent owner is the person or entity who controls the commercial operation of a vessel and is responsible for deciding ports of call and the cargoes to be carried.  Very often the disponent owner is not the registered owner having title to the vessel but a party who has previously chartered the vessel from the registered owner or another charterer.  PETER BRODIE, DICTIONARY OF SHIPPING TERMS (4th Ed. 2003).

*punctual and regular payment of the hire . . . the Owners shall be at liberty to withdraw the vessel from the service of the Charterer. . ."* Exhibit 2, lines 58-62.

14. The Time Charter further provided that *"lashing/unlashing is to be performed in the Charterers' time, the vessel remaining fully onhire. Provided local regulations permit, the deck cargo is to be lashed/secured/unlashed by the crew as is customary in the logs trade as required by the Charterers . . .* (Exhibit 2, Rider Clause 47) and that *"The Charterers to be responsible for all damages caused to the vessel and/or her equipment by stevedores etc. . ."* Exhibit 2, Rider Clause 48.

15. The Vessel was delivered to Wajilam on July 2, 2004 at 0630 hours GMT upon dropping the outbound sea pilot at Inchon, South Korea and proceeded to the loading port of Mati, Philippines in accordance with Wajilam's instructions.

16. The Vessel arrived at Mati on July 8, 2004 at 2030 hours GMT and, having loaded 15,276.11 cubic metres of logs, sailed on July 23 at 2136 hours GMT for Tuticorin, India via Singapore to take on bunker fuel.

17. The Vessel arrived at Tuticorin on August 3, 2004 at 2230 hours GMT and on completion of discharge August 15 at 0200 hours local time the Vessel was redelivered from Wajilam to Oceantrade upon dropping the pilot on August 15, 2004 at 0600 hours local time (August 14, 2004 at 2330 hours GMT).

18. Wajilam has improperly deducted certain amounts from hire and has failed to pay the balance of hire of $52,201.05 due Oceantrade despite repeated requests. A true and correct copy of Oceantrade's Preliminary Final Hire Statement,dated August 17, 2004 and showing a balance of $52,201.05 due Oceantrade is attached hereto as Exhibit 3. Despite Oceantrade's demands for payment, Wajilam denies any debt to Oceantrade.

·19.    In accordance with Clause 66, Oceantrade's claim for payment of sums due is subject to London arbitration and English law.    Exhibit 2.    Oceantrade intends to initiate arbitration in due course.

20.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration proceedings.

21.    This cause of action accrued on August 17, 2004, and upon information and belief, it will take until at least December 31, 2008 to arbitrate this matter to its conclusion.

22.    Based on the preceding, Oceantrade's total claim against Wajilam is the following:

| | | |
|---|---|---|
| A. | Principal claim: | $52,201.05 |
| B. | Interest at 6.0% from August 17, 2004 through December 31, 2008 | $13,703.85 |
| C. | Costs (arbitrators fees, etc.): | $ 5,000.00 |
| D. | Attorney's Fees | $25,000.00 |
| | Total Sought: | $95,904.90 |

23.    Wajilam is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Wajilam Export (Singapore) Pte Limited with, upon information and belief, the following financial institutions:  ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank;

Société Générale; UBS AG; Wachovia Bank, N.A.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; or any other financial institution within the Southern District of New York.

24.     While all disputes arising out of the Time Charter are to be arbitrated in London, England, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty Claims of the Federal Rules of Civil Procedure, as well as 9 U.S.C. § 8, and is not and cannot be considered a waiver of the parties' agreement to arbitrate.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.     That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Wajilam Export (Singapore) Pte Limited with the financial institutions noted above in paragraph 23;

2.     That Wajilam Export (Singapore) Pte Limited and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.     That judgment be entered in favor of James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust, and against Wajilam Export (Singapore) Pte Limited in the amount of $95,904.90; and,

4.      That this Court grant James N. Hood as Liquidating Trustee of the Oceantrade

Corporation Liquidating Trust, such other and further relief which it may deem just and proper.

Dated: New York, New York
       March 5th , 2008

                                    HOLLAND & KNIGHT LLP

                              By:   _____

                                    James H. Hohenstein
                                    Lissa D. Schaupp
                                    HOLLAND & KNIGHT LLP
                                    195 Broadway
                                    New York, NY 10007-3189
                                    (212) 513-3200
                                    Telefax: (212) 385-9010
                                    E-mail: jim.hohenstein@hklaw.com
                                            lissa.schaupp@hklaw.com

                                    Attorneys for Plaintiff,
                                    *James N. Hood as Liquidating Trustee*
                                    *of the Oceantrade Corporation*
                                    *Liquidating Trust*

## VERIFICATION

STATE OF NEW YORK          )

                                  :ss.:

COUNTY OF NEW YORK        )

JAMES H. HOHENSTEIN, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust ("Plaintiff"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to the Plaintiff is that he is not within the jurisdiction of this Honorable Court.

_____
James H. Hohenstein

Sworn to before me this
5th day of March, 2008

_____
Notary Public

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 2011

# 5071510_v1

# EXHIBIT 1

040701-00 Case 1:08-cv-02360-JES   Document 1-2   Filed 03/06/2008   Page 2 of 36
Received 7/1/2004 10:33:22 F    <seawise@seawise-chartering.co.u'   Page 1 of 2
Subject: ORIENT GLORY / WAJI----l                                    User: LAP

TO..: "BULK AMERICA"
FROM: Seawise Chartering London( Tel+44 20 7626 4300)
DATE: 01-JUL-2004 15:23
MSG.: 1364758


HERE IS SEAWISE CHARTERING LONDON (TEL +44 207 626 4300)

PHIL / NILS


MV ORIENT GLORY / WAJILAM
-------------------------------------------------------------

PLS FIND HEREWITH THE CLEAN FIXTURE RECAP AND PLS ADVISE US
THE VSLS ITINERARY:-


= ACCT WAJILAM EXPORTS PTE LIMITED SINGAPORE

= DELY: DLOSP SP SOUTH KOREA PIOO ATDNSHINC (INTENTION INCHON)

= LCAN: JULY 1-3, 2004 (ETR JULY 2 AM AGW, UCE, WP)

= DUR : ONE TCT WITH LOGS (NO MOHAGONY LOGS) FROM PHILIPPINES AND/OR
  MAYLASIA TO INDIA WITH DURATION ABT 35-40 DAYS WOG

= REDEL: DLOSP ATDNSHINC 1SP INCHOPT INDIA

= TRADE: WW TRADING VIA SP(S) SB(S) SA(S) AA AWIWL

= CARGO EXCLUSIONS: ONLY HARMLESS LOGS PERMITTED

= BOD/BOR: BOD EXPECTED ABT 475 MT IFO AND ABT 75 MT MDO.  BOR ABT SAME AS
  ACTUALLY ON BOARD ON DELIVERY.  PRICES BENDS USD 200/MT FOR IFO AND
  USD 300/MT FOR MDO.  BOD DELY PAYABLE TOGETHER WITH FIRST HIRE PAYMENT

= HIRE : USD 14000 DAILY INCLOT

= HIRE PAYABLE -1ST HIRE ( 15 DAYS) + BOD TO BE PAID TO HEAD OWNERS
  WITHIN 3 B/DAYS FM DELY OF VSL

= ILOHC: CHOPT REDLIVER VESSEL WITH DIRTY HOLDS PAYING USD 4000 LSUM

= LASHING/ UNLASHING, IF RQSTD BY CHRTRS USD 4000/- PER VOY

= V/C/E: USD 1250 PER 30 DAYS OR PRORATA

= CHRTRS RETAIN RIGHT TO DEDUCT THE COST OF REDLY BNKRS FROM LAST
  HIRE, IN CASE LAST HIRE INSUFFICIENT THEN FM SECOND LAST HIRE.

= OWNERS TO CNFM VSL IS FULLY FITTED LOGGER AND HV SUFFICIENT
  STAUNCHIONS ON DECK AND LASHING MATERIAL.

= CHTRS CAN ONLY DEDUCT MAXIMUM USD 250/PORT FOR ESTIMATED OWNERS ITEMS

= 5 PCT TTL
END OFFER


ALL TERMS CONDITIONS AS PER OWNERS EXECUTED NYPE 1946  ON MV
'ORIENT GLORY' BETWEEN OCEAN TRANSPORT AND " PARKROAD CORP, SEOUL"
LOGICALLY AMENDED AS PER TERMS AGREED AND ALONG WITH FOLLOWING
ALTERATIONS

040701-005 Case 1:08-cv-02360-JES   Document 1-2    Filed 03/06/2008   Page 3 of 36
Received 7/1/2004 10:33:22 /   -   <seawise@seawise-chartering.co.u
Subject: ORIENT GLORY / WAJ مل                                    User: LAP

CLAUSE 50: AT THE END ADD: GENCON B/L'S TO BE ISSUED

CLAUSE 71: DELETE AND INSERT: CREW DOES NOT TALLY LOGS

CLAUSE 72 : FRIST LINE OF FIRST PARA DELETE " LASH, SECURE, DUNNAGE"
          (AS CREW HAVE TO LASH/SECURE/DUNNAGE AS PAYING FOR THE SAME)
          .

AWTNG YR CONFIRMATION ON RECAP PLS


PLSD TO HEAR

THKS & BRGDS
NILS LUEDECKE
-ABO-

MOBILE : +44 79 39 4994 32

# EXHIBIT 2

APR. 13. 2004  4:02PM    JAMES HOOD LLC    Fax:2039319757    Jan 20 2008 12:15pm P002
SSY NEW YORK 203 356 2011    NO. 0426   P. 1/29

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party** made and concluded in *SEOUL, KOREA* ...........................*8th* day of *MARCH*............. ~~192~~2004
2  Between *PARKROAD CORPORATION, SEOUL*.............................................................................................................
3  Owners of the good *"ORIENT GLORY"*....................Steamship/Motorship ............................................... of *(See Clause 29)*
4  of ......................tons gross register, and ...................... tons net register, having engines of ................................. indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed .......................................................
6  at ......................... of about ........................ cubic feet bale capacity, and about ........................ tons of 2240 lbs.
7  deadweight capacity (cargo and bunkers, including fresh water and stores ~~not exceeding one and one-half percent of ship's deadweight capacity,~~
8  ~~allowing a minimum of fifty tons)~~ on a draft of ..................... feet ..................... inches on ............ Summer freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about ..................... tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about .....................*13* knots on a consumption of about *21 MT IFO (180 CST)* ~~tons of best Welsh coal~~ - best grade fuel oil - best grade Diesel oil,
11  ~~now~~ *trading* ...........................................................................................................................................
12  .................................... and *OCEANTRADE CORPORATION* ........................ Charterers of the City of *MARSHAL ISLANDS* .........

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  about *11/13 mos period + about 11/13 mos period at Charterers option (about means +/- 15 days at Charterers option in each*
15  *period Charterers to declare 2nd period by 31 Jan, 2005* ...................................... within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations*
   *hereunder.*
18  Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port India/Japan range port in Owners'*
19  *options any time day or night, Sundays and Holidays included.*
20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be
22  ready to receive *any permissible cargo under this Charter Party* with clean-swept holds and tight, staunch, strong and in every way fitted for the service,
   having water ballast, ~~winches~~ *cranes* and
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complements of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, ~~including petroleum or its products,~~ in proper containers, *in such lawful trades, between safe port(S)* excluding *(See Clause 74)*...............
26  ~~(Vessel to not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades between safe ports and/or ports in British North~~
28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29  ~~Mexico, and/or South America,~~ ...........................................................................................................................*and/or Europe*
30  ~~and/or Africa, and/or Asia, and/or Australia, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32  ...........................................................................................................................................................
33  ...........................................................................................................................................................
34  ...........................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:
36  1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and all other charges*
   *relating to the Master, Officers and crew*; shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water, *also for garbage removal, removal of*
   *usual galley and hotel accomidations refuse, engine room refuse etc.–while any compulsory removal of garbage other than*
   *above to be Charterers' account–,lubricating oil and domestic/galley fuel* and maintain her class and keep
38  the vessel in a thoroughly efficient *and seaworthy* state in hull, *cargo spaces,* machinery and equipment *with all international trading*
   *certificates and class surveys valid in accordance with flag/international regulations and requirments at ports of call* for and
   during the service.
39  2.   That *whilst on-hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*
   *Pilotages, Agencies, Commissions boatage on Charterers' business;*
40  Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account *Including cost for crew disembarkation/accomidation if necessary/required.* ~~All other fumigations to be~~
44  ~~for Charterers account after vessel has been on charter for a continuous period~~ of six months or more.
45  Charterers are to provide necessary dunnage and shifting boards *and any additional lashing/securing materials to those already available*
   *on board the vessel on delivery which are according to IMO 1991 and listed in attached appendix*, also any extra fittings requisite for a
   special trade or unusual cargo, but

Case 1:08-cv-02360-AJES Document 1-2 Filed 03/06/2008 Page 6 of 36

APR. 13. 2004 4:03PM    SSY NEW YORK 203 356 2011    JAMES 05JEN 2008 12:15pm P003    Fax:2088197951    Jan 28 2008 12:15pm P003    NO. 0426   P. 2/29

46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel, Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.

48 3. (Bunkering See Clause 37) ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all~~
    fuel remaining on
49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ .......................... ~~tons and not more than~~
50 ................... ~~tons and to be re-delivered with not less than~~ ........................................ ~~tons and not more than~~ ............................ ~~tons.~~

51 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 21,130per day prorata including overtime payable*
52 *15 days in advance* ......................... ~~United States Currency per ton on vessel's total deadweight carrying capacity, including lightness and~~
53 ~~stores, on~~ ............................... ~~summer freeboard, per Calender Month,~~ commencing on and from the day *and time* of her delivery, as aforesaid, and at
54 and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) *at on dropping last outward sea pilot one safe port Singapore/Japan range or one safe*
56 *port Capetown/India range including Aden/PMO or one safe port Skaw/Passero range or one safe port GIB/Capetown range or*
    *one safe port Baltic/Black Sea range including full meal or Boston/Buenos Aires range including Cartibs port in Charterers*
    *option any time day or night, Sundays and Holidays included.* unless otherwise mutually agreed. Charterers are to give Owners ~~not less than~~
    *30/20/10* days approximate and *5/3/2/1 day* definite
57 notice of vessels expected date of re-delivery, and probable port.

58 5. Payment of said hire to be made in New York *Owners' nominated bank* in cash in United States Currency, ~~semi-monthly~~ *every 15 days* in
    advance, and for the last *15 days* half each or
59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* place that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70 lie aground, *in Argentina and in Brazil.*

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74 ~~paying Owners~~ ................................... ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who *if so required to do so by*
    *Charterers* is to sign Bills of Lading for
79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of US$ 10.00 per day for victualling. *Any risk and expenses for supercargo shall be borne by Charterers. Prior boarding*
    *supercargo to sign Owners' standard indemnity.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their
    Agents, to victual Tally
85 Clerks, Stevedore's Foreman, etc., Charterers paying at the convention US$ 3.50 per meal, for all such victualling.

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo. *The vessel has natural ventilation only.*

91 13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~
92 ......................................................................................................................................................
93 ......................................................................................................................................................
    ~~on giving written notice thereof to the Owners or their Agents~~ ....................... ~~days previous to the expiration of the first named term, or any declared option.~~

94 14. That if required by Charterers, time not to commence before *April 20th, 2004* ................................... and should vessel
95 not have given written notice of readiness on or before *May 10th, 2004* ........... *to be narrowed to 7 day spread (ITIN: EYA/D New Zealand 2-3*
    *March/8-10 March and ETA/D One safe port South Korea 26-28 March/Early April, after then 1/2 more more voyages shall be*
    *performed)* but not later than 4 p.m. *It is understood that Owners will keep Charterers closely advised from time of fixture to to*
    *delivery of vessels schedule.* Charterers or
96 ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.~~

97 15. That in the event of the loss of time from *sickness, strike, accident or default of Master, Officers or crew* deficiency of men or stores,
98 fire, breakdown or damages to hull, machinery or equipment,
99 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
    preventing the full *use working* of the vessel *to the Charterers,* the payment of hire shall cease for the time thereby lost *and all extra expensesdirectly*
    *involved including bunkers consumed during period of suspended hire shall be for Owners account;* and if upon the voyage the speed
    be reduced by

Case 1:08-cv-02360-JES    Document 1-2    Filed 03/06/2008    Page 7 of 36

APR. 19. 2004  4:04PM    JAMES HOOD LLC    Fax:2039319757    Jan 20 2008 12:16pm P004/030
SSY NEW YORK 203 356 2011    NO. 0426    P. 3/29

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.
102   16. That should the Vessel be lost, money paid in advance and *not earned (reckoning from the date of loss or being last heard of)* shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105   The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107   ~~17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men~~ *(See Clause 66)*
110   18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including General
111 Aver-
112 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
113 deposit to be refunded at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
114 might have priority over the title and interest of the owners in the vessel.
115   19. That bill dereliets and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
116 Crews proportion. General Average shall be adjusted, stated and settled *in London in English Law to apply,* according to ~~Rules 1 to 15, inclusive, 17 to~~
117 ~~22, inclusive, and Rule F of~~
118 York-Antwerp Rules 1924, *as amended 1994* ~~at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by~~
119 ~~these~~
120 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
121 ~~United States money at the rate prevailing on the date made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
122 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
123 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
124 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
125 ~~required, be made by the goods, shippers consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
126 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account of the~~
127 ~~place of adjustment in the name of the adjuster, pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
128 ~~United States money.~~
129 ~~In the event of accident, danger, damage, or disaster before or after commencement of the voyage, resulting from any cause whatsoever,~~
130 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
131 ~~goods, the shipper and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
132 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
133 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
134 ~~ships belonged to strangers~~ *Charter hire not to contribute to General Average*
135   Provisions as to General Average in accordance with the *New Jason Clause* above are to be included in all bills of lading issued hereunder.
136   20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as in quantity, and the
137 cost of replacing same, to be allowed by Owners.
138   21. That as the vessel may be ~~from time to~~ time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
139 convenient place, bottom cleaned and painted whenever Charterers and *Captain* think necessary, at least once in every six months, reckoning from
140 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
141
142
143   22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* derricks) capable of handling lifts *as per Clause 29* ~~up to three~~
144 ~~tons, also~~
145 providing ropes, falls, slings and blocks. ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
146 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric*
147 *light/sufficient light(sufficient light to mean that lighting equipment on board is in good working condition as per class and*
148 *ship's construction)* ~~lanterns and oil for~~
149 night work *in all holds simultaneously free of expense to the Charterers,* ~~and vessel to give use of electric light when so fitted, but any additional~~
150 ~~lights over those on board to be at Charterers' expense.~~ The
151 ~~Charterers to have the use of any gear on board the vessel.~~
152   23. Vessel to work night and day, if required by Charterers, and all winches/*cranes* to be at Charterers' disposal during loading and discharging;
153 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen~~
154 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
155 ~~port or labor unions prevent crew from driving winches,~~ *then* Winchmen to be *employed and* paid by Charterers. In the event of a disabled winch or winches
156 */cranes (in no case crew to be required to drive cranes),* or
157 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any *direct related and proven* loss of
158 time occasioned
159 thereby. *Once shore gear is employed, vessel to return on hire proportionately. Owners to have the right if they choose, to*
160 *negotiate/arrange for shore cranes themselves.*
     24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
     ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels~~
     ~~etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
     ~~of which are to be included in all bills of lading issued hereunder:~~
     U. S. A. Clause Paramount
     ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
     ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
     ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
     ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
     ~~Both to Blame Collision Clause~~

161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier~~
167  25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging. *The vessel however neither to force ice or follow ice breakers.*
170  .  26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugboat and linemen* insurance, crew, and all other matters, same as when trading for their own account.
172  27.  A commission of ~~2 1/2 per cent is payable by the Vessel and Owners c~~ *1.25 percent to*
173  *Simpson Spence & Young, NY and 1.25 percent to J.B. Chartering* ...........................................................
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175  28.  An address commission of ~~2 1/2~~ *3.75* per cent payable to *Charterers* ............................................... on the hire earned and paid under this Charter.

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.) Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8ᵀᴴ, 2004

### CLAUSE 29 - VESSEL'S DESCRIPTION

MV. ORIENT GLORY
1) NAME AND EX NAME: MV. ORIENT GLORY / SUN GLORY / MUN KIM
2) YEAR BUILT: MAR. 1987
3) FLAG: PANAMA
4) TYPE: SDLBC
5) DWT AND DRAFT IN
   SUMMER SALT: 26,583MT DWT ON 9.543M
   WINTER SALT: 25,840MT DWT ON 9.345M
   TROPICAL SALT: 27,330MT DWT ON 9.741M
   FRESH: 25,650MT DWT ON 9.54M
   TROPICAL FRESH: 27,313MT DWT ON 9.954M
6) TPI/TPC (FULL/LIGHT); 37.63T/34.27T
   LIGHTSHIP: 9,013MT
7) LOA/BEAM/DEPTH: 167.20/26.00/13.30M
8) IMO NUMBER: 8512932
9) CUBIC CAPACITY GRAIN AND BALE/TOTAL AND EACH HOLD
   NO.1 4,777.79/4,587.88CBM
   NO.2 7,441.16/7,180.54CBM
   NO.3 7,420.68/7,192.65CBM
   NO.4 7,621.34/7,210.16CBM
   NO.5 6,656.91/6,510.56CBM
   TTL 33,917.88/32,681.79CBM
10) NUMBER OF HOLD/HATCHES: 5HOLDS /5 HATCHES
11) HOLD SIZE (L X W X H) AND
    CLEAR (FLAT) TANKTOP DEMENSION
    HOLD DIMENSION
    NO.1 21.56L x 13.5H x (26.0A + 4.35F)W
    NO.2 25.95L x 13.5H x 26.0W
    NO.3 25.95L x 13.5H x 26.0W
    NO.4 26.12L x 13.5H x 26.0W
    NO.5 25.41L x 13.5H x (26.0F + 7.25A)W
    DIMENSION OF FLAT TNAKTOP
    No.1 21.56L x (17.5 + 4.35)W
    No.2 25.95L x 17.5W
    No.3 25.95L x 17.5W
    No.4 26.12L x 17.5W
    No.5 25.41L x (17.5 + 7.25)W
12) HATCH SIZE (L X W):
    NO. 1  13.86 X 13.05M  NO. 2-4  19.25 x 13.05M
13) TYPE OF HATCH COVERS: MACGREGOR FOLDING
14) WATERLINE TO TOP OF HATCHCOAMING: 5.50M FULL / 10.30M LIGHT
15) GEAR CAPACITY/SPEED NO ELECTRIC POWER
    NO.1 20T/ 20M/MIN / 125KW CONT 285KW ED 15PERCENT
    NO.2 22T/ 20M/MIN / 125KW CONT 285KW ED 15PERCENT
    NO.3 22T/ 20M/MIN / 125KW CONT 285KW ED 15PERCENT
    NO.4 20T/ 20M/MIN / 125KW CONT 285KW ED 15PERCENT
16) MAX OUTREACH OF CRANES: 5M EACH
17) NO GRAB ON BOARD
18) INTERNATIONAL GRT/NRT: 15,834/9,013MT
19) SPEED/CONSUMPTION
    ;ABOUT 13 KNOTS ABT 21MT IFO 180 CST
    BASIS BEAUFORT 4 OR LESS SMOOTH SEA AND CLEAN BOTTOM.
    NO MDO AT SEA EXCEPT FOR MANOUVRINGS, CONGESTIVE WATER.
    MONTHLY ABT 15MT MDO.
20) CONSUMPTION IN PORT (24 HRS)

1

Case 1:08-cv-02360-JES    Document 1-2    Filed 03/06/2008    Page 10 of 36
JAMES HOOD LLC                Fax:2038319757                Jan 20 2008 12:17pm P007/030

APR. 13. 2004  4:05PM    SSY NEW YORK 203 356 2011                        NO. 0426  P. 6/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

```
        ABT 3MT IFO WORKING
        ABT 2MT IFO IDLE
21) BUNKER SPEC.
    :IFO TB ISO RME25, MDO TB DMB STANDARD
22) FRESH WATER PRODUCTION (DAILY): 10MT/DAY PRODUCTION
23) FW TANK CAPACITY: 254MT
24) TYPE MAIN ENGINE AND BHP
    :HITACHI B&W 6L50MCE / 5870PS X 117RPM X 126Gr.
25) ITF: N/A K FLAG ND KOREAN OFFICER ON BOARD
26) CO2 FITTED FOR HOLD: FITTED EACH HOLD
27) AUSSIE HOLD LADDERS: FITTED EACH HOLD
28) STANCHIONS: FIXED ND PORTABLE STANCHION FITTED ON DECK
29) STRENGTHENED FOR HEAVY CARGOES: NOT FITTED ON DECK ND HOLD
30) STRENGTH (MT/M2) ON TANK TOP:
    DECK: 4MT/M2
    HATCHCOVERS: NO.1 2.3MT/M3 NO.2-5 3.0MT/M2
    FLOOR SPACE HOLD BY HOLD: NO.1-2 65M2 / NO.2-3 NO.3-4 NO.4-5 96.2M2
31) PEDESTAL HEIGHT FROM WEATHERDECK: 8.2M
32) NATIONALITY OF OFFICERS/CREWS: 8 KOREA/ 2 KOREA, 10 PHILIPPINES
33) MASTER NAME: CHANGYONG JEONG
34) H AND M VALUE: USD6,160,000
35) UNDERWRITERS: HYUNDAI MARINE & FIRE INSURANCE
36) OWRS PNI CLUB
    :THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LTD.
37) WHERE BUILT/HOME PORT : HAKODATE SHIPYARD CO., LTD. / JEJU, REPUBLIC OF
    KOREA
38) LAST DRY DOCK AND SPECIAL SURVEY: NOV. 02nd. 2000 / APR. list. 2002
39) NEXT DRY DOCK AND SPECIAL SURVEY
    :NOV. 01st. 2003 / OCT. 25th. 2005 ? JAN. 01st. 2006
40) INMARSAT TLX/FAX/TEL: 444057991 /+872-763417375/+872-763417376
41) VESSEL CALSS: KR
42) MAX CONSTANTS EXCL STORES: 250MT
43) SMC/DOC ISSUE/VALID DATE:
    :SMC SEP. 04th. 2002 / SEP. 03rd. 2007
    DOC FEB. 07th. 2003 / FEB. 06th. 2008
```

### CLAUSE 30 - VESSEL'S SUITABILITY FOR LOGS CARRIAGE:

The Owners warrant that the vessel is fitted for the loading/stowing, carriage and discharge of a full cargo of logs on and under deck, including a full set of permanent and collapsible stanchions in good condition and all lashing materials for deck cargo as per IMO 1991 and loading manual as is customary for this trade.

Owners will provide Charterers with a full inventory list of all lashing materials on board which will be available for Charterers (or their Agents) use at their care and responsibility throughout the duration of the current charter and form part of the Charter-Party.
Any additional materials of any kind in excess of IMO regulations will be supplied by Charterers at their time and cost and they will remain on board for the whole period of the Charter-Party. Upon completion of this Charter Party, Charterers will have the option to remove same and use for their trade. Owners will not be responsible for the condition of such materials.

The Owners warrant that holds, weather decks and hatch covers have no obstructions and are clear of projections such as Australian hold ladders or where same are in place they are or will be adequately protected from damage

2

Case 1:08-cv-02360-JES    Document 1-2    Filed 03/06/2008    Page 11 of 36
JAMES HOOD LLC              Fax:2038319757              Jan 20 2008 12:17pm P008/030

APR. 13. 2004  4:05PM    SSY NEW YORK 203 356 2011                NO. 0426   P. 7/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

by the Charterers' intended cargo failing which the Charterers will not be
responsible for any possible damage to such items. Such adequacy of
protection, or its lack, to be confirmed clearly during on-hire survey which
to be binding in that respect in as far as Charterers' responsibility for
the duration of the Charter-Party.

Normal wear and tear to be excepted.

### CLAUSE 31 - VESSEL'S SUITABILITY FOR GRAB DISCHARGE - HOLD/GEAR WARRANTY

The vessel is warranted suitable for normal grab discharge and no cargo is
to be loaded in places inaccessible to grab discharge.  The Charterers
shall have the liberty to use bulldozers with rubber tires or with protected
steel belt (to Master's satisfaction) in vessel's holds, but always within
the vessel's tank top strengths.

#### HOLD/GEAR WARRANTY

Owners warrant that vessel has free and unobstructed holds.  The Owners
further warrant that the gear as described is certified with proper markings
on the blocks and that each cargo gear is capable of lifting cargo/equipment
with a maximum weight under the hook, stated in Clause 29.

### CLAUSE 32 - HATCH COVERS:

The vessel is to be fully fitted with hatch covers complete and in good
order at all hatches. The Owners will maintain the vessel's hatch covers
watertight. All hatches are to be carefully tendered by crew to prevent
leakage. Owners to agree to perform hose-testing/watertight testing of
hatches prior loading at first loading port upon vessel's delivery and at
any time during the period if customary and necessary for intended cargoes.

### CLAUSE 33 - HOLDS - VESSEL'S CLEANING - INTERMEDIATE HOLDS CLEANING -

The condition of holds on delivery is to be suitable to load the
Charterers' intended cargo in all respects.

#### A) VESSEL'S CLEANING:
The Charterers shall have the option to redeliver the vessel with unclean/un
swept holds against a lump sum payment of USD 4,000 in lieu of cleaning,
disposal and removal of dunnage/debris/bark and any lashing material.

#### B) VESSEL'S HOLDS CLEANING FOR FIRST VOYAGE
Vessel shall present at all load ports for first voyage with cargo carrying
compartments clean, dry, free of rust and/or scale and/or any contaminants
and/or residual cargo to the satisfaction of the port warden and/or grain
surveyor and/or such other recognized local authority or surveyor as local
regulations or shippers may require and/or nominate to receive any relevant
cargo, including but not limited to steel, mineral sands, grain, fertilizers,
ores and coal.
If on presentation for loading at any or all of the loading port(s) the
vessel should fail to pass hold cleanliness survey then all expenses for
cleaning and or fumigation including but not limited to cost of standby of
trucks, labor and mechanical equipment but always limited to maximum one
shift vessel to be put off-hire from the time of failing until the time of
passing re-inspection and any time lost/expenses incurred thereby to be for
Owners' account.

3

# RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8ᵀᴴ, 2004

Vessel throughout the term of this Charter Party is to be maintained in a suitable condition for the carriage of grain or other cargoes requiring similar high standards of cleanliness. Failure to pass cleanliness surveys shall not be an Owners' liability where such failure results from Charterers' cargo residues.

## C) INTERMEDIATED HOLDS CLEANING

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by local regulations, at the rate of USD 700 per hold and extra US$ 100 per hold when dunnage removal/storage is agreed. F/W used for such cleaning to be for Charterers' account. If any such operation requires vessel sailing away from shore/port for the purpose of cleaning and/or disposing wash-water, same shall be carried out at Charterers' time and expenses. In connection with any such operation, the Owners shall not be responsible if the vessel's holds are not accepted or passed by the port or any other authority.

## CLAUSE 34 - WELDING PADEYES:

As the case may require, the Charterers are to have the option of welding padeyes by their own arrangement and at their own time and expense and same are to be removed by the Charterers in their time and at their expense.
However the Charterers have the option of redelivering the vessel without removing them, paying US$ 20.00 per piece in lieu thereof.

## CLAUSE 35 - ON AND OFF HIRE SURVEYS

It is agreed that an independent surveyor nominated by the Charterers and accepted by the Owners, will carry out a joint on-hire survey to be held at port of delivery, unless mutually agreed for same to be held at first load port, and that an independent surveyor nominated by Owners and accepted by the Charterers will carry out a joint off-hire survey to be held at port of redelivery.

Cost of on-hire survey to be for Charterers and off hire survey to be for Owners' account. Surveys are to ascertain the general condition of the vessel (which to include holds, hatch covers, cargo handling gear, gear wires, gangways, holds ladders and crane access ladders, stanchions, lashing materials, hoggs wires, chains, spares etc..) and also bunker quantities on board.

## CLAUSE 36 GMT:

*Delivery and redelivery time is to be based on G.M.T.*

## CLAUSE 37 - BUNKER CLAUSE:

Bod as on board quantity about metric ton IFO 450/550 and about 70/100 metric ton MDO bunkers on redelivery to be about same as on delivery. Prices same both ends USD 190.00 per metric ton for IFO and USD 300.00 for MDO.

The Charterers are to take over and pay the value of the bunkers on board on delivery with the first hire payment. The Charterers have the right to deduct the estimated value of the bunkers on redelivery from the last

4

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

sufficient hire payment.
The Owners have the right to bunker vessel for their own account at the
port(s) of call during the currency of this Charter Party provided such
operations do not interfere with the Charterers' operations.

Owners to supply vessel with enough bunker quantities and to have  sufficient
bunkers on departure of last loading port to reach the nearest bunker port
en route.

Bunkers specification as per vessel's description. If RME is not available
in South Africa or any place where RME is customarily not available, then
Charterers may replenish with RME 25 and if DMB is not available supply gas
oil instead. Whenever bunkers are supplied to the vessel the sample to
govern quality shall be the sample drawn on board the vessel at custody
transfer point jointly by the supplier and the Chief engineer or Owners and
Charterers' appointed surveyors. The jointly drawn sample of quality shall
be binding. Analysis of said sample in accordance with the ISO 8217 test
methods at a DNVPS reputable and dedicated laboratory shall be binding and
conclusive for both parties. Any claim in relation to fuel purchased by
Charterers shall be notified to the Charterers, in the first instance,
within thirty days from the date of delivery of the said fuel, with
documentation to be provided as early as practicably possible in order to
enable Charterers to process the necessary claims against suppliers.
Absence of notification within thirty days from delivery will be deemed as
waiver of such claim. Quantity supplied shall be finally determined by
sounding of the vessel's tanks.

### CLAUSE 38 - CHARTERERS' FLAG/COLOURS:

The Charterers are to have the privilege of flying their own house flag and
painting the funnel and/or hull with their own markings. The funnel and/or
hull is to be repainted in Owners' colours before redelivery, cost of and
time for painting and repainting is to be for Charterers' account.

### CLAUSE 39 - WAR RISK AND EXTRA WAR RISK INSURANCE PREMIUM:

Annual War Risk insurance on hull and machinery and crew for worldwide
trading excluding designated war risk area is to be for the Owners'  account.
In the event that, having obtained the Owners' prior approval, the
Charterers trade the vessel under this charter to any area which is
designated at any time as a war risk area by the Owners' War Risk Insurance
underwriters, any extra War Risk Insurance Premium (including extra premium
for incurring blocking and trapping risks) and any extra crew war bonus paid
by the Owners is to be for the Charterers' account. However it is understood
that such extra insurance premium is not to exceed the cost of equivalent
cover on the same value with Lloyds of London.   It is agreed that the
insured value of the vessel for the purposes of this clause is US$---. In
consideration of which, the Owners are waiving any further claim in damages
for trading to territorial waters or places excluded under the London Market
War Risk Trading Warranties.  Conwartime 1993 War Risk Clause is deemed
incorporated in this Charter Party.

### CLAUSE 40 - QUARANTINE:

Normal quarantine time and expenses to enter the port are to be for the
Charterers' account but any time on detention and expenses for quarantine
due to pestilence, illness, ect. of Master, Officers and Crew to be for the

5

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

Owners' account.

### CLAUSE 41 - VESSEL'S CERTIFICATES:

The Owners guarantee that the vessel is in possession of such valid and approved certificates as may be required at ports of call during the currency of this Charter. Any time lost by not having or in obtaining such certificate to be for the Owners' account.

Vessel's cargo gear and all other equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all time in possession of valid and up to date certificates of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitting to work due to failure of Master and/or Owners and/or Owners' agents to comply with the aforementioned regulations or because vessel is not in possession of such valid and up to date certificates of efficiency, then Charterers may suspend hire for the time thereby lost and Owners to pay all expenses incurred incidental to and resulting from such failure but only to the extent that such requirements are limited to those imposed by international conventions, rules and regulations as required by the vessel's class and flag administration. Vessel to be in possession of the necessary certificates to comply with the Safety and Health Regulations and all current requirements at all ports of call during the currency of this Charter.

If vessel is not in possession of a valid and suitable tonnage certificate or if the gross and/or net registered tonnage are not acceptable by any port or dock authority which levies it charges on the gross and/or net registered tonnage, Owners to pay any increase in or additional port, dock or other dues and any extra expenses whatsoever occasioned thereby.

### CLAUSE 42 - INTERNATIONAL SAFETY MANAGEMENT:

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the Owners' account.

### CLAUSE 43 - PORT STATE CONTROL/OFF HIRE:

In case the vessel fails to meet the relevant Port State Control safety rules and regulations the Owners will take immediate corrective measures and any stevedore standby time and other expenses involved, directly related to the vessel including but not limited to stevedore standby, including off-hire will be for the Owners' account but limited to one shift only and always provided that Charterers operations are hindered and alleged damage is directly related to such delay and well proven.

6

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8ᵀᴴ, 2004

### CLAUSE 44 - WEATHER REPORT/OCEAN ROUTES:

The Charterers are to have the option of supplying independent Ocean Routes or any other similar organizations' advice to the Master during the voyage(s).
The Master shall comply with the reporting procedures of the routing service. The vessel is to be capable of steaming at all times in good weather at about 13 knots during the currency of this Charter Party.  For the purpose of this Charter Party 'good weather conditions' shall be defined as weather conditions in winds not exceeding Beaufort force 4.

Evidence of weather reports is to be taken from ship's deck log and independent weather bureau reports.  In the event of consistent discrepancy between the deck logs and the independent weather bureau reports in all events Charterers will endeavour to supply Owners with copy of preliminary voyage analysis issued by independent Ocean Routes for each voyage and/or speed loss and over-consumption if any, within a fortnight from receipt of Ocean Routes. In regular intervals not exceeding 1 months at maximum or after one complete voyages whichever is longer, Charterers to provide statements with any speed/performance claims for finalization with Owners, within reasonable period of time from presentation. Absence of notification within 15 days from expiry of each such period will be deemed as waiver of such claim. If an amicable solution can not be reached then, the matter to be referred to arbitration and its decision to be final and binding for both parties.

### CLAUSE 45 - DEVIATION/OFF HIRE:

Should the vessel deviate or put back whilst on voyage by reason of an accident or breakdown, or in the event o f loss of time either by sickness or accident to the crew or any other person on board the vessel (other than passengers and supercargo traveling by request of the Charterers) or by reason of refusal of the Master or crew to perform their duties, or by reason of salvage or stowaway or refugee, or of oil pollution even if alleged, or capture/seizure, detention by any authority/legal process  unless same attributable to the Charterers or their agents, the hire shall be suspended for any time lost by reason of inefficiency until vessel is again efficient in the same position or equidistant and the voyage resumed therefrom and all directly related proven expenses incurred, directly related to the vessel including but not limited to stevedore standby but limited to maximum one gang, including bunkers consumed during period of suspended hire, shall be for the Owners' account.

### CLAUSE 46- NOTICES:

The Master/Owners are to tender notice of vessel's delivery
- on fixing as per charter-party laydan, then monthly, last month 15/9/7/3/1 days to Charterers.

The Master is also to notify the Agents at first loading port vessel's ETA.

### CLAUSE 47 - LOADING UNDER MASTER'S RESPONSIBILITY AND SUPERVISION:

The Master shall supervise the stowage of the cargo thoroughly, shall   direct and control all loading, handling, stowing, lashing, securing and discharge of  the  cargo  and  he  is  to  furnish  the  Charterers  with  daily loading/discharge reports and with stowage plans.

# RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8ᵀᴴ, 2004

The vessel is to be loaded in accordance with the vessel's timber deck cargo loading manuals (which are to be at the Charterers' disposal for inspection) and IMO code of safe practice for ships carrying timber deck cargoes 1991. Such deck and/or hatch cargo is to be carried at the Shippers' risk and is never to exceed the vessel's deck and/or hatch strength. Any deck and/or hatch cargo is always to be carried consistent with vessel's stability and loading manuals and stowed and secured under the Master's responsibility and supervision.

Lashing/unlashing is to be performed in the Charterers' time, the vessel remaining fully on hire. Provided local regulations permit, the deck cargo is to be lashed/secured/unlashed by the crew as is customary in the logs trade as required by the Charterers. The Charterers are to pay lumpsum US$ 4,000.00 for this service.

Bills of Lading for deck and hatch cargo are to be claused:
"Carried on deck without liability for loss or damage howsoever caused."

### CLAUSE 48 - STEVEDORE DAMAGE:

The Charterers to be responsible for all damages caused to the vessel and/or her equipment by stevedores and/or Charterers' servants/agents provided Master notified Charterers and/or their Agents in writing/telex/cable of such damage within 24 hours of occurrence, or in case of hidden damage as soon as practicable after discovery of same but in any case latest prior to redelivery. Master to notify the party who caused the damage and to hold them responsible in writing/telex/cable. If requested by Charterers, Master to co-operate with the agents to arrange for a survey at Charterers time and expenses to define, estimate the extent of damage.

Damages which affects vessel's seaworthiness and/or cargo worthiness and/or class and/or safety of crew to be repaired by Charterers without delay after each occurrence in Charterers time and costs to the Master and/or class surveyor's satisfaction.

Damages which do not affect vessel's seaworthiness and/or cargo worthiness and/or Class and/or safety of crew may be repaired during vessel's next regular dry dock concurrently with Owners work and Charterers to pay Owners the repair costs against vouchers.

### CLAUSE 49 - VESSEL'S BREAKDOWN:

Any stevedoring and/or labor charges for breakdown of the vessel's equipment not caused by the Charterers or their servants will be for the Owners' account.

### CLAUSE 50 - BILLS OF LADING:

Bills of Lading issued under this employment will be the Charterers' or their subsidiary company (in which case Charterers remaining responsible) or by sub-Charterers Bill of Lading forms as approved by BIMCO. The Owners/Master authorize the Charterers or their Agents to sign same on their behalf in accordance with mate's receipts. The Charterers hereby indemnify the Owners for consequences or discrepancies or later amendments as may be required. Should original Bills of Lading not be available when vessel arrives at each discharge port, the Owners are to instruct the Master to

8

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

allow discharge against the Charterers signing standard P and I Form (as
included in this Charter Party) without a bank guarantee. Discharge only to
commence on receipt by Owners of faxed copy of the letter of indemnity
signed by Charterers. No through B/L and liner B/L to be issued.

### BIMCO HAMBURG RULES
Neither the Charterers nor their agents shall permit the issue of any Bill
of Lading, waybill or other documents evidencing a contract of carriage
(weather or not signed on behalf of the Owners or on the Charterers' behalf
or on behalf of any sub-Charterers) incorporating, where not compulsorily
applicable, the Hamburg Rules or any other legislation imposing liabilities
in excess of the Hague or Hague-Visby Rules. The Charterers shall indemnify
the Owners against any liability, loss or damage which may result from any
breach of the foregoing provision of this Clause.

### CLAUSE 51 - VESSEL'S P.I. CLUB:

The Charterers are to have the benefit of the Owners' entry with their
Protection and Indemnity Club as far as the rules permit.
Vessel's P and I Club: AXA Corporate Solutions.

Charterers are to insure the vessel with T.C.L. with a first class
international group P & I Club which to fax confirmation letter for Owners
tracing before delivery, and cargo claim if any to be settled according to
the latest NYPE Interclub Agreement.

### CLAUSE 52 - USA OIL POLLUTION CERTIFICATE:

The owners guarantee that a U.S.A. Oil Pollution Certificate is issued and
is valid for the vessel.

### CLAUSE 53 - VESSEL ELIGIBLE FOR BUNKERS IN U.S.A.:

The Owners guarantee that the vessel is eligible for bunkers in the United
States of America, its territories and possession in accordance with U.S.
Coast Guard Regulations set forth in Title 33 Charter I Part 155 subpart C
and 156 Code of Federal Regulations.  The Owners also guarantee that the
vessel is eligible for bunkers in any other country.

### CLAUSE 54 - PANAMA/SUEZ CANALS:

The vessel is fully fitted for Panama/Suez Canal transit and in possession
of necessary certificates on board in conformity with current canal
regulations/requirements.

### CLAUSE 55 - NOT ARAB BLACKLISTED:

The Owners guarantee that the vessel has not traded Israel and is not Arab
blacklisted.

### CLAUSE 56 - CANCELLATION DUE TO WAR:

Both parties have the option of canceling this Charter Party, the following
countries. U.S.A., Great Britain, France, Russia, People's Republic of China.

It is understood that war means direct war between these nations and does

JAMES HOOD LLC
APR. 13. 2004  4:08PM     SSY NEW YORK 203 356 2011          Fax:2038319757          Jan 20 2008 12:25pm P015/030
                                                                                  NO. 0426   P. 14/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

not include hostilities or civil war where any of the above countries support opposing sides. Owners shall not unreasonably take advantage of this clause in case of a limited local conflict.

### CLAUSE 57 – PROTECTIVE CLAUSES:

It is mutually agreed that the General Clause Paramount, the New Both-to-Blame Collision Clause, New Jason Clause, Conwartime 1993 War Clause, as attached, are incorporated in this Charter Party and the Bills of Lading.

### CLAUSE 58 – NOTICE FOR DELAY OF HIRE PAYMENT:

When hire is due and not received, the Owners before exercising the option of withdrawing the vessel from the charter Party will give the Charterers 48 hours notice, Saturday, Sundays and Holidays excluded, and will not withdraw the vessel if hire is paid within these 48 hours.

### CLAUSE 59 – CANCELLATION OF C/P BY CHRS IN CASE OF OFF-HIRE:

Should the vessel be off-hire more than thirty consecutive days, the Charterers have the right to cancel the balance period of this Charter Party by giving notice to the Owners without prejudice to any other right the Charterers may have under this Charter provided the vessel is cargo empty. If vessel is loaded it is agreed between Owners and Charterers to re-discuss the termination of the Charter Party in order not to expose vessel and/or either party to more damages.

### CLAUSE 60 – CAUSES OF OFF-HIRE:

Should the vessel be boycotted, picketed, blacklisted delayed or rendered inoperative by strikes, labor stoppages or undergo any similar incident at any port or place by shore and/or port laborers and/or any authorities, by reason direct proven of the vessel's flag, registry, manning or ownership or terms and conditions on which members of the Officers/Crew are employed, or by reason of or ownership, management, operations of control, or by reasons of vessel's construction and/or her cargo gear and/or her fittings and/or her other equipment, all directly related proved consequences and any extra fittings incurred there from to be for the Owners' account and the Charterers are entitled to place the vessel off-hire for any time lost prorata by such reason.

### CLAUSE 61 – SMUGGLING:

Any delay, expenses and/or fine incurred on account of smuggling shall be for the Owners' account if caused by the officers and/or crew, or shall be for the Charterers' account if their supercargo and/or their staff or agents are responsible for such smuggling.

### CLAUSE 62 – AGENCY FEES:

Charterers shall keep Owners advised of vessel's itinerary and agents at all ports of call. Charterers' agent to provide normal ship's biz, such as Cash to Master, crew mail, small repairs, crew to doctor etc. without additional charge as long as no additional charge thereby incurred to Charterers provided the agents tariff permit special service such as major repairs, hospitalization, general average etc. to be carried out by Charterers' agent against Owners' payment of the respective fee or Owners have the option to

10

APR. 13. 2004  4:08PM    JAMES HOOD LLC    SSY NEW YORK 203 356 2011    Fax:2036319757    Jan 20 2008 12:25pm P016/030    NO. 0426    P. 15/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
### CHARTER PARTY DATED MARCH 8TH, 2004

appoint their own agent or protecting agent, if necessary. Which case(s) no Owners' expenses can be reserved unless evidenced by Charterers agent's report.

#### CLAUSE 63 - COMMUNICATIONS & VICTUALLING COSTS:

The Charterers are to pay US$ 1,500.00 per month pro rata for all victualling, entertainment and communication and representation expenses.

#### CLAUSE 64 - P. & C. CLAUSE:

This fixture including rate, terms and conditions is to be kept private and strictly confidential.

#### CLAUSE 65 - I.C.A. 1996:

"The Inter-Club New York Produce Exchange Agreement 1996" is to be deemed incorporated into this Charter Party.

#### CLAUSE 66 - ARBITRATION:

Any dispute or difference under this Charter Party shall be referred to Arbitration in London and settled pursuant to the current Ar bitration Act as per English Law. Any Arbitrator under this agreement is to be a commercial shipping man. For disputes where the total amount claimed by either party does not exceed US$ 50,000.00 the Arbitration shall be conducted in accordance with the small claims procedure of London Maritime Association.

*BIMCO STANDARD LAW AND ARBITRATION CLAUSE 1998 –
ENGLISH LAW, LONDON ARBITRATION*

This Contract shall be governed by and construed in accordance with English Law and any dispute arising out of or in connection with this Contract  shall be referred to arbitration in London in accordance with the Arbitration Act 19963 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that is will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that is has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

Case 1:08-cv-02360-JES    Document 1-2    Filed 03/06/2008    Page 20 of 36

APR. 13. 2004  4:09PM    SSY NEW YORK 203 356 2011    JAMES HOOD LLC    Fax:2038319757    Jan 20 2008 12:26pm P017/030    NO. 0426  P. 16/29

# RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8ᵀᴴ, 2004

In cases where neither the claim nor any counterclaim exceeds the sum of  US$ 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

### CLAUSE 67 - RETURN PREMIUM:

Charterers are to have the benefit of any return insurance premium received by Owners from underwriters as and when received from underwriters, by reason of the vessel being in port for minimum of thirty (30) days provided the vessel if on hire for such time.

In case the vessel is off-hire for more than thirty (30) days, provided cargo is already laded, Owners and Charterers to mutually discuss and find an amicable settlement as to how to perform the remaining period of this charter party in this case.

### CLAUSE 68 - Deleted

### CLAUSE 69 - ACCESS TO VESSEL AND DOCUMENTATION:

In case of any dispute as regards the ship's hull, machinery or equipment condition or her class or her compliance with any national or international conventions, codes or regulations directly affecting Charterers commercial use of the ship, the Owners and the Master shall authorize Charterers' surveyor or other representative full access on board and permission to peruse and obtain a true copy of all ship's documents and certificates as on board or otherwise available.

### CLAUSE 70 - BOTTOM FOULING:

The Owners shall not be responsible for any deficiency in speed/consumption provided that:
- the vessel stays in a tropical sea port for an period exceeding 30 consecutive days, and
- the deficiency in speed/consumption is entirely attributable to hull and/or propeller fouling by marine growth and barnacles during such a 30 consecutive days stay in a tropical sea port.
However, if deficiency requires underwater cleaning by divers and this mutually agreed, then same to be for Charterers time and cost at the first suitable port/area where such operation can take place.

If the hull and/or propeller is fouled on delivery, Owners are to be responsible for any deficiency in speed/consumption.

### CLAUSE 71 - LOGS TALLY IN THE FAR EAST:

If required by the Charterers, crew are to perform cargo tally at discharging port(s) as per Charterers' instructions and Charterers are to pay US$ 0.50 per log for this service. It is to be understood that this tally is to serve as a check on existing tallies performed and recognized locally. Crew tally will not affect Charterers/Owners' liability which 50/50 for cargo shortages as per the Interclub NYPE Agreement. Remuneration for crew tally to be handed to vessel's command at last discharge port of relevant voyage. Owners crew will endeavor to assist as best as possible. However no responsibility is undertaken or liability admitted there from in respect of the accuracy of the tally performed.

12

APR. 13. 2004  4:09PM   JAMES HOOD LLC   SSY NEW YORK 203 356 2011   Fax:2038319757   Jan 20 2008 12:28pm P018/030   NO. 0426   P. 17/29

RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
CHARTER PARTY DATED MARCH 8TH, 2004

CLAUSE 72 - CARGO EXCLUSIONS

CHARTERERS ARE TO LOAD, STOW, TRIM, LASH, SECURE, DUNNAGE, TALLY AND
DISCHARGE CARGO AT THEIR RISK AND EXPENSE IN ACCORDANCE WITH IMO AND
OTHER LOCAL REGULATIONS. THE FOLLOWING CARGOES ARE SPECIFICALLY
EXCLUDED:
ARMS, AMMUNITION, ASPHALT, ACIDS, ASBESTOS, BOMBS, BORAX, BORINGS,
BLACK POWDER, BLASTING CAPS, CALCIUM CARBIDE, CALCIUM OXIDE, CASTOR
BEANS, CREOSOTED GOODS, CALCIUM HYPOCHLORITE, COPRA, COPRA PRODUCTS,
COTTON, CONTAINERS, DYNAMITE, EXPLOSIVES, SUNFLOWERSEED EXPELLERS,
FERRO SILICON, HIDES, KAOLIN, LIVESTOCK, MOTOR SPIRIT, MOTOR BLOCKS
AND TURNINGS, DRI, HBI, FISHMEAL, BLK CEMENT, MILITARY EQUIPMENT,
MOBILE HOMES, MODULAR HOMES,
NUCLEAR SUBSTANCES, NAPTHA, OILCAKES BUT SOYABEANMEALS ALLOWED,
PITCH, PETROLEUM AND IT'S PRODUCTS BUT PETCOKE IS SPECIFICALLY
ALLOWED, REFRIGERATED CARGO, RADIO ACTIVE SUBSTANCES, SEEDCAKES BUT
CITRUS PULP PELLETS ARE SPECIFICALLY ALLOWED, TAR AND IT'S PRODUCTS,
TALC, TNT, ZINC ASHES, AMMONIUM NITRATE APPENDIX B, AUSTRALIA INBOUND
FERTILIZER NOT TO ALLOW.

SCRAP CLAUSE TO READ:

CHRTS HAVE THE LIBERTY TO LOAD TWO CARGO OF SCRAP DURING THIS PERIOD
C/P. SCRAP LIMITED TO HMS 1+2 AND/OR SCREDDED SCRAP. FIRST LAYER OF
SCRAP TO BE LOWERED AS CLOSE TO THE TANKTOP AS POSSIBLE SO AS TO MAKE A
PROPER CUSION TO AVOID DAMAGE TO THE TANKTOP.

CHARTERERS UNDERTAKE TO SUPPLY ON BOARD AT THEIR EXPENSE, DUNNAGE AND/OR
OTHER MATERIALS WHICH MASTER REASONABLY DEEMS NECESSARY INCLUDING
CUSHION MATS ON DECK TO PROVIDE SAFE PROTECTION FROM DAMAGE BY LOADING
SCRAP.

SCRAP NOT TO BE FIRST CARGO AFTER DELIVERY
SCRAP NOT TO BE LAST CARGO PRIOR REDELIVERY

PETCOKE CLAUSE:

CHARTERERS ARE ALLOWED TO CARRY CARGOES OF PETCOKE.
IF CHARTERERS CARRY PETCOKE THEN CHARTERERS TO SUPPLY SHORE LABOR OR
CREW IN CHARTERERS OPTION AND SUFFICIENT FRESH WATER/CHEMICAL DETERGENT
AT THEIR TIME AND EXPENSE FOR WASHING DOWN OF HOLDS. IF CREW IS
REQUESTED BY CHARTERERS TO CARRY OUT HOLD CLEANING SUB. TO LOCAL
REGULATIONS PERMIT THE CHARTERERS TO PAY USD 900 PER HOLD TO OWNERS.
PETCOKE MENTIONED HEREIN IS ONLY LIMITED TO THE TYPE OF NON-HAZARDOUS /
NON-DANGEROUS GREEN DELAYED TYPE AND/OR CALCINED PETCOKE. PETCOKE NOT TO
BE CARRIED AS LAST CARGO PRIOR TO HER REDELIVERY TO OWNERS.

CONCENTRATE CLAUSE:

CHARTERERS ALLOWED TO CARRY 2 (TWO) CARGOES OF CONCENTRATE PER ANNUM.
CHARTERERS TO LOAD, STOW, TRIM AND DISCHARGE CONCENTRATES IN ACCORDANCE
WITH IMO AND LOCAL REGULATIONS AND WITHIN THE TRANSPORTABLE MOISTURE
CONTENT OF THE CARGO AS ASCERTAINED IN ACCORDANCE WITH IMO CODE OF SAFE
PRACTICE FOR BULK CARGOES. ANY EXTRA TIME AND EXPENSE DIRECTLY RESULTING

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

FROM THE CARRYING OF CONCENTRATES, TO BE FOR CHRTS ACCOUNT.

SALT / SULPHUR PROTECTION CLAUSE

CHARTERERS ALLOWED TO CARRY 2 (TWO) CARGOES OF SALT PER ANNUM.
CHARTERERS ARE ALSO ALLOWED TO CARRY 2 (TWO) CARGOES OF SULPHUR PER
ANNUM. CHARTERERS ENDEVOUR TO USE AS FEW HOLDS AS POSSIBLE, PROVIDED
VESSEL'S STABILITY TRIM AND STRESS PERMIT. BEFORE LOADING ALL HOLDS
ASSIGNED FOR SALT/SULPHUR TO BE LIME WASHED OR HOLD BLOCKER TO BE USED
IN OWNERS OPTION, BY CHARTERERS IN CHRTS TIME AND AT CHRTS EXPENSE TO
THE MASTERS SATISFACTION. CARGO TO BE LOADED/STOWED/TRIMMED/DISCHARGED
STRICTLY IN ACCORDANCE WITH IMO AND/OR ANY OTHER LATEST REGULATIONS/RULES
APPLICABLE TO SUCH CARGO. ALL FRESH WATER USED FOR IRRIGATION ON TO ROCK
SALT DURING LOADING/VOYAGE/DISCHARGE TO BE FOR CHARTERERS ACCOUNT. AFTER
DISCHARGE, CHARTERERS TO SUPPLY SUFFICIENT FRESH WATER AT THEIR EXPENSE FOR
SHINING DOWN ALL HOLDS. SUCH CARGOS NOT TO BE THE LAST CARGO PRIOR TO
REDELIVERY. CHARTERERS ARE ALLOWED TO USE SHIPS CREW TO PERFORM LIME
WASHING/APPLICATION OF HOLD BLOCKER AND REMOVAL OF SAME AND REPAINTING AS
NECESSARY AGAINST PAYING $ 6,000 LUMP SUM TO BE PAID TO OWNERS BESIDES
NORMAL INTERMEDIATE HOLD CLEANING, BUT ALWAYS SUBJECT TO PRIOR CONSENT OF
MASTER/CREW AND LOCAL REGULATIONS PERMITTING AND ALL TIME SO USED TO BE FOR
CHARTERERS ACCOUNT OWNERS/MASTER ARE NOT TO BE RESPONSIBLE FOR PASSING HOLD
INSPECTION FOR NEXT CARGO AND ANY CONSEQUENCES WHATSOEVER CAUSED DUE TO SUCH
ARRANGEMENT.

CEMENT CLINKER CLAUSE

CHARTERERS ALLOWED TO CARRY 4 CARGOES OF CEMENT CLINKER  PER ANNUM.
FRESHWATER USED TO WASH DOWN THE HOLDS AFTER DISCHARGE TO BE FOR CHRTS
ACCT. CHRTS OPTION TO USE CREW FOR HOLD WASHING AND CLEANING AGAINST A
LUMP SUM OF USD 900.00 PER HOLD. NO CEMENT CLINKER TO BE LOADED ON FINAL
VOYAGE PRIOR TO REDELIVERY.

GRANITE BLOCKS CLAUSE

CHARTERERS ALLOWED TO CARRY 2 (TWO) CARGOES OF GRANITE BLOCKS PER ANNUM
CHARTERERS ARE ALLOWED TO LOAD GRANITE BLOCKS IN VESSEL'S HOLDS HOWEVER
SAME HAS TO BE STOWED, DUNNAGED, LASHED, SECURED TO THE MASTERS/OWNERS
SATISFACTION AND NOT EXCEEDING VESSEL'S TOTAL STRENGTH.

LOGS CLAUSE

CHARTERERS ALLOWED TO CARRY CARGOES OF LOGS (EXCL AFRICA/VENEZUELA LOGS)
VESSEL IS FITTED FOR LOADING LOGS AND VESSEL HAS LOG LOADING EQUIPMENT
SUCH AS LASHING MATERIAL FOR FULL CARGOES ON DECK UPON DELIVERY AND
VESSEL TO MAINTAIN SAME IN GOOD WORKING ORDER THROUGHOUT THE TIME
CHARTER PERIOD, HOWEVER, THE SUBSEQUENT REPLACEMENTS OF SUCH EQUIPMENT
TO BE SUPPLIED BY THE CHARTERERS AT THEIR ACCOUNT, EXCEPT NORMAL WEAR
AND TEAR.

DECK CARGO CLAUSE

CHARTERERS ALLOWED TO CARRY 2 (TWO) DECK CARGOES PER ANNUM

JAMES HOOD LLC    Fax:2038319757    Jan 20 2008 12:27pm P020/030
APR. 13. 2004  4:10PM    SSY NEW YORK 203 356 2011    NO. 0426    P. 19/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

CHARTERERS HAVE THE OPTION TO CARRY CARGO ON DECK AT THEIR OWN RISK AND
EXPENSES BUT ALWAYS WITHIN VESSEL'S STABILITY, WITHIN VESSEL'S DECK AND
HATCH COVER STRENGTHS, IN ACCORDANCE WITH IMO/SOLAS RULES, AND TO
MASTER'S PRIOR APPROVAL AND SATISFACTION.

### CLAUSE 73 - ARREST

Should the vessel be arrested during the currency of this Charter Party at
the suit of any person having or purporting to have a claim against or any
interest in the vessel, hire under this Charter Party shall not be payable
in respect of any period whilst the vessel could not work as a result of
such arrest. If such arrest should be Charterers or their servants' matter,
vessel not to be set off-hire.

### CLAUSE 74 - TRADING EXCLUSION

ALBANIA, ANGOLA, ISRAEL, LEBANON, LIBYA (INCLUDING GULF OF SIDRE/SIRTE),
ERITREA, SOMALIA, CONGO, TUNISIA (ALLOWED IF NO CIVIL WAR EXISTING),
DEMOCRATIC REPUBLIC OF (FORMERLY ZAIRE), LIBERIA, SIERRA LEONE, CABINDA,
CUBA, KAMPUCHEA, NAMIBIA, TURKISH OCCUPIED CYPRUS, PACIFIC CIS PORTS,
YUGOSLAVIA, FEDERAL REPUBLIC OF YEMEN (NORTH AND SOUTH YEMEN), MAURETANIA,
FILAND, SWEDEN.

ALASKA TO BE ALLOWED AGAINST CHTRS' PAYMENT OF EXTRA INSURANCE PREMIUM IF
ANY (BUT EXCLUDING DURING DEC/FEB PERIOD) SYRIA/IRAQ TO BE ALLOWED FOR
UN/USA APPROVED CGOS ONLY BUT NO CIVIL WAR EXISTING.

CUBA TO BE ALLOWED BUT ONLY FOR THE CASE APPROVED BY USA AND VSL NOT ALLOW
TO CALL THERE 6MTHS PRIOR TO VSL'S REDELY

NORTH KOREA TO BE ALLOWED FOR UN/USA/S.KOREAN APPROVED CGOS ONLY

ALL WAR AND WARLIKE/TRAPPED/BLOCKED ZONES,
CLOSED AREAS ACCORDING TO LONDON UNDERWRITERS AND ANY PORTS OR PLACES WHERE
U.N./U.S.A. TRADE EMBARGO EXISTS. SHOULD THE POLITICAL SITUATION IMPROVE,
ALL ICE BOUND PORTS, VESSEL NEVER TO BE ORDERED/OBLIGED TO FOLLOW ICE
BREAKERS NEITHER TO BE REQUIRED TO FORCE ICE.

CHARTERERS GUARANTEE THAT THEY WILL NOT TRADE THE VESSEL DIRECTLY BETWEEN
PRC AND TAIWAN (I.E. VESSEL SHOULD CALL A THIRD PORT OTHER THAN PRC AND
TAIWAN WHEN VESSEL SAILING BETWEEN PRC AND TAIWAN) RESPECTIVELY OR VICE
VERSA UNLESS POLITICALLY CORRECT OR OTHERWISE MUTUALLY AGREED.

ANNUAL BASIC WAR RISK INSURANCE ON HULL, MACHINERY AND CREW FOR OWNERS
ACCOUNT BUT ANY EXTRA WAR RISK INSURANCE OR EXTRA BONUS DUE TO THE VESSEL
TRADING IN CHARTERERS SERVICE TO BE FOR CHARTERERS ACCOUNT.

IT IS UNDERSTOOD THAT CHARTERERS CANNOT AND WILL NOT TRADE IN EXCLUDED
AREAS HOWEVER, CHARTERERS HAVE THE OPTION TO TRADE WITHIN AND THROUGH WAR
ZONES AS OUTLINED BY INSURANCE UNDERWRITERS BUT ALWAYS SUBJECT TO APPROVAL
BY INSURANCE UNDERWRITERS. IF CHARTERERS ELECTS TO PROCEED INTO OR THROUGH A
WAR ZONE, CHARTERERS WILL FURNISH OWNERS WITH VOYAGE DETAILS PRIOR TO
LOADING FOR OWNERS SUBSEQUENT SUBMISSION TO INSURANCE UNDERWRITERS.. SAID
APPROVAL NOT TO BE UNREASONABLY WITHHELD AND ANY ADDITIONAL INSURANCE
PREMIUMS TO BE FOR
CHARTERERS ACCOUNT.

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

ANY AMENDMENTS AS PROVIDED BY INSURANCE UNDERWRITERS TO EXCLUDED AREAS AND
WAR ZONES DUE TO CHANGE IN POLITICAL CLIMATE OR OTHER CIRCUMSTANCES IS TO
INCLUDED BOTH DELETIONS AND ADDITIONS AND IS UNDERSTOOD TO BE INCORPORATED
INTO THE TERMS AND CONDITIONS OF THIS CHARTER PARTY.

CHARTERERS SHALL HAVE THE OPTION OF BREAKING INSTITUTE WARRANTY LIMITS
BY GIVING DUE ADVANCE NOTICE TO OWNERS AND SEEK OWNERS' PRIOR CONSENT
WHICH SHALL NOT BE UNREASONABLY WITHHELD. CHARTERERS PAYING
ANY EXTRA INSURANCE PREMIUM THEREBY INCURRED AS QUOTED BY
VESSEL'S HULL AND MACHINERY UNDERWRITERS. THIS EXTRA INSURANCE TB
COVERED BY OWNERS WITH THEIR HULL UNDERWRITERS AND TB REIMBURSED
BY THE CHARTERERS UPON PRESENTATION BY FAX OF H+M UNDERWRITERS
RELEVANT INVOICE(S).
IT IS FURTHER EXPLICITLY UNDERSTOOD BETWEEN OWNERS AND CHARTERERS
THAT THE OPTION FOR BREAKING INSTITUTE WARRANTY LIMITS IS NULL AND
VOID SHOULD THE VESSEL IN ORDER TO BE ABLE TO REACH ANY PORT/
PORT OUTSIDE INSTITUTE WARRANTY LIMITS IS OBLIGED TO FOLLOW ICE BREAKERS
OR NEEDS TO FORCE ICE.

### CLAUSE 75 - POLLUTION LEGISLATION

Warranted that during the currency of this Charter Party, the Owners will
comply fully with any international legislation enacted with respect to
Owners' financial responsibility for oil pollution (such expression to
include any rules and/or regulations issued there under) by any Government,
Department thereof or other authority including the International Convention
on Civil Liability for Oil Pollution Damage, 1965 and the United States
Water Quality Improvement Act of 1970, and rules and/or regulations issued
there under, etc. Should any delay to the vessel or any extension of the
voyage occur from failure to comply with the said act, rules, regulations or
oil pollution legislation, the vessel to be considered off-hire for the
period of such delay or extension. The Owners hereby accept responsibility
for all the consequences and agree to indemnify the Charterers against all
claims, liabilities and cost (including Charterers' legal fees) which result
from Owners' failure to comply with the said act, rules, regulations or oil
pollution legislation.

### CLAUSE 76 - ACCOMMODATION FOR SUPERCARGO(ES)

Supercargo(es) to be furnished with accommodation to at least minimum
standard for a chief mate. For vessel having an Owners' cabin, same to be
given to the supercargo(es).

### CLAUSE 77 - WATCHMEN

Ship's watchmen if required by Master to be supplied from crew, unless
compulsory which case same to be for Charterers' account. All other watchmen
required by custom or port or cargo security to be for Charterers' account.

### CLAUSE 78 - ICE

Vessel shall not be required to enter any ice-bound ports or any ports   where
lights or light-ships have been or are about to be withdrawn by reason of
ice or where there is risk that in the ordinary course of things the vessel
will not be able on account of ice to safely enter the port or to get out
after having completed lading or discharging. Vessel is not to force ice nor
follow ice breakers. Ice advisors to be for Charterers' account if on

16

Case 1:08-cv-02360-JES JAMES HOOD LLC Document 1-2 Fax:2036319757 Filed 03/06/2008 Jan 20 2006 12:33PM Page 25 of 36 P022/030

APR. 13. 2004  4:10PM      SSY NEW YORK 203 356 2011                    NO. 0426   P. 21/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

account of ice the Master considers it is dangerous to remain in the loading
or discharging place for fear of vessel being frozen and or damaged he has
liberty to sail to a convenient open place and wait Charterers  fresh
instructions.  It is understood that vessel remains on hire during this
period.

### CLAUSE 79 - DERATIZATION CERTIFICATE

The Owners are to provide and keep on board valid Deratization Exemption
Charterers throughout the charter period. Deratization shall always be  for
Owners' account except for cargo.

### CLAUSE 80 - WIRELESS STATION

Charterers and the Supercargo(es) have the right of using vessel's wireless
station at cost according to tariff.

### CLAUSE 81 - SALE OF THE VESSEL

The Owners shall have the right to sell the vessel together with existing
charter. New Owners to confirm that they will take over and perform balance
period under this Charter Party according to all terms and conditions of
this Charter Party and any addenda thereto.  Transfer of Charter shall always
be subject to the approval of the new Owners by the Charterers but such
approval shall not be unreasonably withheld.  The Owners shall duly notify
the Charterers by giving one month notice of their intention to sell.

### CLAUSE 82 - INVENTORY OF CHARTERERS' EQUIPMENT

The Master to keep a record of all Charterers' gear, equipment and/or stores
supplied to the vessel and to maintain same in good condition.  Such gear,
equipment and/or stores to be redelivered to Charterers prior to redelivery
of vessel to Owners or, if requested by Charterers, at any time during the
period of the Charter in like good order and condition as supplied (ordinary
wear and tear excepted).

### CLAUSE 83 - CREW ASSISTANCE

Time Charter hire to include rendering customary assistance by the crew  (see
clause 26) inter alia
(a) raising and lowering of derricks/cranes and/or gangways in preparation
   for loading and/or discharging
(b) First opening and last closing of hatches in preparation for loading
   and/or discharging
(C) Closing and opening of hatches in the event of adverse weather
   conditions which may affect the condition of cargo carried on board
   during loading and discharging if local regulations permit. ·
(d) shifting vessel during lading and discharging and shifting berth,
   however linesmen/pilotage/tugs, if any, to be for Charterers' account
(e) docking and undocking in connection with loading/discharging cargo and
   bunkers
(f) bunkering
(g) maintaining power while loading and/or discharging and care for
   winches/derricks
(h) maintaining sufficient electric power on all cranes whilst loading and
   discharging
(I) to prepare vessel's hatches and cargo gear as much as possible

17

JAMES HOOD LLC    Fax:2038319757    Jan 20 2008 12:33pm  P023/030

APR. 13. 2004  4:11PM    SSY NEW YORK 203 356 2011    NO. 0426  P. 22/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

prior to arrival to ports or commencement of operations

Officers and crew to shape up vessel's hatches and derricks/cranes as much as possible prior to arrival at loading and/or discharging places so as to permit immediate commencement of loading and/or discharging operations, if weather permits.

Above services to be rendered provided port regulations permit.

### CLAUSE 84 - GARBAGE

Deleted

### CLAUSE 85 - BLACK LIST

Owners warrant that the vessel has not Israel and is not blacklisted by  Arab countries.
Owners confirm vessel is not black listed by Richard Bay Coal Terminal.

### CLAUSE 86 - ITF

Owners guarantee that the present terms and conditions of employment of the crew comply with the ITF Agreement or a bona fide Trade Union Agreement  that is acceptable to the ITF and their representatives and will remain so (or the duration of this Charter Party).
In the event of directly related/proven loss of time and/or extra expenses incurred due to boycott of the vessel (whether actual or threatened) and/or dispute with labour because of vessel's flag or nationality of Owners, Master, Officers or crew, or the terms and conditions under which the  Master, Officers or crew are employed, then vessel shall be placed off hire and any expenses directly attributable resulting thereto including but not limited to standby of trucks, labour and mechanical equipment or removal of vessel from berth but limited to maximum one gang, shall be for Owners' account.  An ITF approved certificate to be available upon arrival at first port.

### CLAUSE 87 - CHANGE OF NAME

The vessel shall not change Ownership, name, flag, class, technical and/or crew management during the currency of this Charter Party without Charterers' prior approval, which shall not be unreasonably withheld.
Owners' option to sell the vessel with the Time charter attached subjects  to Charterers' approval of new Owners, such approval not to be unreasonably withheld.
Charterers are to be given advance notice of any change of Master or Chief Officer.

### CLAUSE 88 - BIMCO DOUBLE BANKING CLAUSE

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment  as may be required to enable any of the operations mentioned in this clause

18

### RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
### CHARTER PARTY DATED MARCH 8TH, 2004

safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the    vessel's

hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting form such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

CLAUSE 89 - LIGHTERAGE

If so required by Time-Charterers, the vessel may be ordered to load from    or discharge alongside into a seagoing vessel at a recognized safe lightening place or anchorage inside or off port but always within port commercial limits where customary for such operations to be performed.
Charterers to provide adequate fenders up to Masters' satisfaction for the operation and to pay all expenses involved, including all/any extra or additional insurance and Charterers to b e responsible for and repair any   and all damages resulting from this operation and suffered by the vessel.

The whole operation to be under Master's supervision and to his complete satisfaction with regards to the safety of the operation and of the vessel.
Delivery of cargo once over-side into the daughter vessel in the case of discharging constitute right and true delivery under the relevant Bills of Lading for that voyage. Master always has the right to cease operations if he is concerned about vessel's crew's safety.

CLAUSE 90 - REGULATIONS

The vessel shall comply with all Laws and Regulations at any port of call under this Charter Party, including all Environmental Regulations and Commonwealth of Australia Navigation (Orders) Regulations in particular but not limited to Marine Orders. Part 32, (Cargo Handling Equipment) which govern the vessel's hold and crane ladders as well as ship's cargo handling equipment, and Marine Order Part 23 (Equipment - Miscellaneous and Safety Measures) which govern gangways and lighting. The vessel shall also comply with the requirements set out in the amendment to the Code of Safe Practice for Solid Bulk Cargoes (B.C. Code) dated 1996 for the Carriage of Bulk Coal by Sea. This is covered by Marine Notice 121/96 (or later revision/amendment) issued by the Australian Maritime Safety Authority (AM SA). Owners warrant that the vessel complies with current regulations at   all ports of call regarding the prevention of Asian Gypsy Moth infestation. The vessel shall be placed off-hire for all directly related proven time lost during any period(s) when the relevant Authority declared the vessel to be in non compliance with any of the foregoing provision and Owners to   be responsible for any expenses directly attributable thereto including but not limited to standby of trucks, labor but maximum to one shift for stevedores

19

APR. 13. 2004  4:11PM    SSY NEW YORK 203 356 2011    JAMES HOOD LLC    Fax:2038319757    Jan 20 2008 12:34pm P025/030    NO. 0426    P. 24/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

standby and mechanical equipment.

### CLAUSE 91 - REQUISITION

Should the vessel be requisitioned by the government of the vessel's flag during the period of this Charter Party, the vessel shall be deemed to be off hire during the period off such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. The period during which the vessel is on requisition to the said government shall count as part of the period provided for in this Charter party.

In this event Charterers shall have the option of canceling this Charter Party and no consequential claim may be made by either party.

### CLAUSE 92 - CARGO GEAR AND LIGHTS

The Owners shall give, free of expenses to Charterers, full use of the vessel's lighting on deck and in the cargo compartments, which shall be adequate for cargo operations.
The Charterers shall have the used of any cargo gear on board the vessel. Shore crane-men to be employed at Charterers' or Receivers' risk and  expense. If required by Charterers, the vessel shall work night and day and all cargo handling gear (as described in clause 29) shall be at the Charterers' disposal during loading and discharging.  All cargo handling gear (as described in clause 29) including all derricks, cranes, winches and grabs, if fitted shall be kept in good working order and appearance and  the vessel shall provide sufficient power to drive them, free of expense to Charterers.
In the event of a deficiency unless caused by the Stevedores and/or shore crane-men and/or Charterers' agents, for any period affecting any of this equipment including but not limited to the vessel's hatch covers and the vessel's technical ability to ballast and de-ballast, hire shall be reduced pro rata to the number of hatches affected depending on the deficiency but only to the extent that time is actually lost to the Charterers.   If required by the Charterers, the owners shall bear the cost of hiring shore gear in lieu thereof in which case the vessel shall remain on hire.  Owners to have the right to negotiate arrange shore cranes themselves. All reasonable, unavoidable and directly related expenses including but not limited to cost of standby of trucks, labor but maximum to one shift for stevedores standby and mechanical equipment or removal of the vessel from the berth to be for Owners' account.

### CLAUSE 93 - BANKING DETAILS

?

### CLAUSE 94 - EXTENDED PERIOD DUE TO OFF HIRE

Should vessel be off hire during the currency of this Charter Party for any reasons whatsoever, Charterers have the option of adding such off hire period to the Charter period stipulated in line 14 of this Charter Party but off-hire for purpose of SS/DD always excluded.  The hire payable in respect of any such added hire period shall be as stipulated in Clause 4 of this

Case 1:08-cv-02360-JES    Document 1-2    Filed 03/06/2008    Page 29 of 36
JAMES HOOD LLC    Fax:2038319757    Jan 20 2008 12:34pm P026/030

APR. 13. 2004  4:12PM    SSY NEW YORK 203 356 2011    NO. 0426    P. 25/29

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8ᵀᴴ, 2004

Charter Party. Charterers are to declared whether they add off hire period 3 months prior vessels' redelivery.

### CLAUSE 95 - P & I BUNKERING DEVIATION CLAUSE

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or   ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the Chartered voyage. Owners' action to take bunker must never interfere with Charterers' business.

### CLAUSE 96 - Deleted.

### CLAUSE 97 - Deleted.

### CLAUSE 98 - Deleted.

### CLAUSE 99 - Deleted.

### CLAUSE 100 - Deleted.

### CLAUSE 101 - Deleted.

### CLAUSE 102 - Deleted.

### CLAUSE 103 - TAXES AND DUES

All taxes and/or dues on cargo, freight and/or charter hire to be for Charterers' account except tax and duties levied against the Owners in the country of domicile or ship's flag.

### CLAUSE 104

(aa) First 15 days' hire plus bunkers on delivery value to be paid within 3(three) banking days after vessel's delivery and Charterers' receipt of relevant invoice. Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements but maximum USD 500 per port as well as estimated bunkers on redelivery value. However final accounting and settlement of Owners expenses to be arranged by Charterers within 1 month after redelivery.

(bb) U.S. Customs-Trade Partnership Against Terrorism (C-TPAT) Clause

The Charterers have voluntarily signed the C-TPAT agreement with the U.S. Customs Service. The Owners, Master and crew will use reasonable efforts to

21

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

assist the Charterers to comply with their obligations under the C-TPAT agreement. However, under no circumstances shall the Owners, Master and crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT agreement signed by the Charterers. The Charterers agree to indemnify and hold the Owners, Master and crew harmless for any claims made against the Owners, Master and crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT agreement signed by the Charterers.

(cc) U.S. Security Clause for Time Chartering

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

(dd) U.S. Customs 24 Hours Rule Clause for Time Charter Parties

(a) If loading cargo destined for the US or passing through US ports in transit, the Charterers shall:

(i) Provide all necessary information, upon request by the Owners, to the Owners and/or their agents to enable them to submit a timely and accurate cargo declaration directly to the US Customs; or

(ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto, submit a cargo declaration directly to the US Customs and provide the Owners with a copy thereof.

In all circumstances, the cargo declaration must be submitted to the US Customs latest 24 hours in advance of loading.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with the provisions of sub-clause (a).

(c) If the Vessel is detained, attached, seized or arrested as a result of the Charterers' failure to comply with the provisions of sub-clause (a), the Charterers shall provide a bond or other security to ensure the prompt release of the Vessel. Notwithstanding any other provision in this Charter Party to the contrary, the Vessel shall remain on hire.

### BOTH TO BLAME COLLISION CLAUSE
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Marine, Pilot of the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-

22

### RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
### CHARTER PARTY DATED MARCH 8TH, 2004

carrying ship or her owners in so far as such loss or liability represents loss of, or goods, paid or payable by the other or non-carrying ship or her Owners to the owners of said goods and s et off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact."

#### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or the consequence of which, the carrier is not responsible by statue, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be  paid for as fully as if the said salving ship or ships belonged to  strangers. Such deposit as the carrier or his agents may deem sufficient  to cover the estimated contribution of the goods and any salvage and  special charge thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

#### PARAMOUNT CLAUSE GENERAL

The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("The Hagues Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("The Hague-Visby Rules") and as enacted in the country of shipment shall apply to this contract. When the Hague-Visby Rules are not enacted in the Country of shipment, the corresponding legislation of the country of destination shall apply, irrespectively of whether such legislation may  only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country  of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this contract.

The Protocol signed at Brussels on 21 December 1979 ("The SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatory or by this Contract.

The charter shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo or live animals.

23

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8TH, 2004

### BIMCO "CONWARTIME 1993"

(1) For the purpose of this Clause, the words:
(A)   "Owners" shall include the ship Owners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master ; and
(B)   "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility  or malicious damage,
blockades (whether imposed against all vessels or   imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to   the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through,   any port, place, area or zone (whether of land or sea), or any waterway   or canal, where it appears that the Vessel, her cargo, crew or  other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.  Should the vessel be within any such place as aforesaid, which only  becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels,   or is imposed selectively in any way whatsoever against vessels of   certain flags or ownership, or against certain cargoes or crews or otherwise, or to proceed to an area where she shall be subject to a belligerents right of search and/or confiscation.

(4) (A) The Owners may effect war risks insurance in respect  of  the Hull and Machinery of the Vessel and their other interests (including, but    not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.
(B)   If the Underwriters of such insurance should required payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or   areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or    calls shall be reimbursed by the Charterers to the Owners at the same   time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:
(A)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call,

24

## RIDER CLAUSE TO M.V. ORIENT GLORY/OTC
## CHARTER PARTY DATED MARCH 8ᵀᴴ, 2004

stoppages, destinations, discharge of cargo, delivery, or in any other   way
whatsoever, which are given by the Government of the Nation under   whose
flag the Vessel sails, or other Government to whose laws the     Owners are
subject, or any other Government, body or group whatsoever acting with the
power to compel compliance with their orders or directions ;

(B)    to comply with the order, directions or recommendations of any war
risks underwriters who have the authority to give the same under the   terms
of the war risks insurance ;

(C)    to comply with the terms of any resolution of the Security Council of
the United Nations, any directives of the European Community, the
effective orders of any other Supranational body which has the right
to issue and give the same, and with national laws aimed at enforcing
the same to which the Owners are subject, and to obey the orders and
directions of those who are charged with their enforcement;

(D)    to divert and discharge at any other port any cargo or part thereof
which may render the vessel liable to confiscation as a contraband
carrier ;

(E)    to divert and call at any other port to change the crew or any part
thereof or other persons on board the Vessel when there is reason to
believe that they may be subject to internment, imprisonment or other
sanctions.

(7) If in accordance with their rights under the foregoing provisions of
this Clause, the Owners shall refuse to proceed to the loading  or
discharging ports, or any one or more of them, they shall immediately inform
the Charterers. No cargo shall be discharged at any alternative port without
first giving the Charterers notice of the Owners' intention to do so and
requesting them to nominate a safe port for such discharge. Failing such
nomination by the Charterers within 48 hours of the receipt of such notice
and request, the Owners may discharge the cargo at any safe port of their
own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of
this Clause anything is done or not done, such shall not be deemed a
deviation, but shall be considered as due fulfillment of the Charter Party.

25

# EXHIBIT 3

BULKAMERICA CORPORATION
137 Rowayton Avenue
Suite 420
Rowayton, Connecticut
USA  06853

As Agents for
OCEANTRADE CORPORATION


| | |
|---|---|
| TO: | NILS |
| COMPANY: | SEAWISE CHARTERING |
| E-MAIL: | dry@seawise-chartering.co.uk |
| DATE: | August 17, 2004 |
| FROM: | LORI ANN PANTALEO |
| NUMBER OF PAGES: | 2 |


### PRELIMINARY FINAL HIRE STATEMENT


OCEANTRADE / WAJILAM
M/V ORIENT GLORY
C/P DTD 07/01/2004

| | | | | | | |
|---|---|---|---|---|---|---|
| **HIRE PAYMENT #4:** | FROM: | 02-Jul-04 | 06:30 HRS GMT | | | |
| | TO: | 15-Aug-04 | 00:30 HRS GMT | | | |
| 43.750000 DAYS @ | | $14,000 | | | USD | 612,500.00 |
| ADDRESS COMMISSION | | | @ | 2.50% | USD | (15,312.50) |
| BROKERAGE COMMISSION | | | @ | 1.25% | USD | (7,656.25) |
| | | | | | USD | 589,531.25 |
| | | | | | | |
| **OFF-HIRE #1:** | | | | | | |
| CRANE BREAKDOWNS | | | | | | |
| 0.784000 DAYS @ | | $14,000 | | | USD | (10,976.00) |
| ADDRESS COMMISSION | | | @ | 2.50% | USD | 274.40 |
| BROKERAGE COMMISSION | | | @ | 1.25% | USD | 137.20 |
| | | | | | USD | (10,564.40) |
| | | | | | | |
| **DELIVERY BUNKERS:** | | | | | | |
| IFO | | 495.480 MT | @ | $200.00 /MT | USD | 99,096.00 |
| MDO | | 74.810 MT | @ | $300.00 /MT | USD | 22,443.00 |
| | | | | | | 121,539.00 |
| | | | | | | |
| **REDELIVERY BUNKERS:** | | | | | | |
| IFO | | 544.966 MT | @ | $200.00 /MT | USD | (108,993.20) |
| MDO | | 71.186 MT | @ | $300.00 /MT | USD | (21,355.80) |
| | | | | | USD | (130,349.00) |
| | | | | | | |
| **EXCESS REDELIVERY BUNKERS:** | | | | | | |
| (BUNKER PRICES AT SINGAPORE AT TIME OF BUNKERING) | | | | | | |
| IFO | | 49.486 MT | @ | $183.00 /MT | USD | (9,055.94) |
| | | | | | USD | (9,055.94) |
| | | | | | | |
| **INTERIM HOLD CLEANING:** | | | | | | |
| | | | | | USD | |
| | | | | | USD | 0.00 |
| | | | | | | |
| **HOLD CONDITION:** | | | | | | |
| ILOHC | | | | | USD | 4,000.00 |
| | | | | | USD | 4,000.00 |
| | | | | | | |
| **SURVEYS:** | | | | | | |
| ON-HIRE | (AWAITING INVOICE COPY) | | | | USD | (75.50) |
| OFF-HIRE | | | | | USD | |
| CLASS SURVEY | TUTICORIN | | | | USD | 1,433.56 |
| HULL DAMAGE SURVEY | ESPERANCE | | | | USD | 860.00 |
| | | | | | | 2,218.06 |

| COMMUNICATION/VICTUALLING/ENTERTAINMENT: | | | | |
|---|---|---|---|---|
| 42.96600 DAYS @ | $1,250 | | USD | 1,790.25 |
| | | | USD | 1,790.25 |
| | | | | |
| OWNERS ITEMS: | | | | |
| FRESH WATER - MATI | | (AWAITING ORIGINAL VOUCHERS) | USD | (404.60) |
| | | | USD | (404.60) |
| | | | | |
| REMITTANCES: | | | | |
| CH #1: | 8-Jul-04 | | USD | (324,289.00) |
| CH #2: | 19-Jul-04 | | USD | (141,750.00) |
| CH #3: | 2-Aug-04 | | USD | (18,262.40) |
| | 10-Aug-04 | | USD | (32,202.17) |
| CH #4: | | | | |
| | | | USD | (516,503.57) |
| | | | | |
| DUE TO OWNERS: | | | USD | 52,201.05 |

PLEASE HAVE CHARTERERS REMIT HIRE BY WIRE TRANSFER AS FOLLOWS:

UBS (THE UNION BANK OF SWITZERLAND)
ZURICH HEAD OFFICE    ZURICH, SWITZERLAND
SWIFT ADDRESS:        UBSWCHZH80A
FOR FURTHER CREDIT:   UBS AG
                      BAARESTRASSE 14A
                      ZUG, SWITZERLAND  6301
ACCOUNT NO.:          273-245603.60Y
FOR CREDIT TO:        SEA VENTURES CORPORATION
REFERENCE:            M/V ORIENT GLORY - WAJILAM - C/P DTD 07/01/2004

BEST REGARDS,
BULKAMERICA CORPORATION
AS AGENTS ONLY